# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. _____

MATTHEW POPKIN, TERRY FREEMAN,
and DORIS RYAN, on behalf of themselves and
all others similarly situated,

        Plaintiffs,

                                          **CLASS ACTION**

v.                                            **JURY DEMAND**

CITIBANK, N.A.; CITIMORTGAGE, INC.;
ASSURANT, INC.; and AMERICAN SECURITY
INSURANCE COMPANY;

        Defendants.

_____/

## CLASS ACTION COMPLAINT

Plaintiffs MATTHEW POPKIN, TERRY FREEMAN, and DORIS RYAN file this class action complaint on behalf of themselves and all others similarly situated against ASSURANT, INC. ("Assurant"); AMERICAN SECURITY INSURANCE COMPANY ("American Security" or "ASIC"); CITIMORTGAGE INC. ("Citimortgage"); and CITIBANK, N.A. ("Citibank").[1]

## INTRODUCTION

1. On November 10, 2010, *American Banker* published an article describing major mortgage lenders' and servicers' questionable and often illegal practices related to force-placed insurance. The article revealed for the first time the exceptionally profitable exclusive relationships, collusive activities, and circular arrangements among the mortgage lenders and servicers, their affiliates, and their cooperating insurers.

2. Lenders and servicers force place insurance when a borrower fails to obtain or

---

[1] Citimortgage and Citibank shall be referenced together as "Citi" or the "Citi Defendants." Assurant and ASIC may be referenced as the "Assurant Defendants."

maintain proper hazard or flood insurance coverage on property that secures a loan.  Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to "force place" a new policy on the property and then charge the premiums to the borrower. This is standard and appropriate.  Plaintiffs do not challenge the practice of force-placing insurance, but the manner in which Defendants exercise their discretion in doing so.

3.     The arrangements revealed by *American Banker* yield participants in these force-placed insurance schemes hundreds of millions of dollars annually.  Just two insurance companies control the national market for forced-placed policies—Assurant and QBE.  These companies and their affiliates enter into exclusive relationships with the major mortgage lenders and servicers to provide the policies.  To maintain their exclusive relationships with these lenders, the insurers pay unearned "kickbacks" of a percentage of the force-placed premiums ultimately charged to the borrower, offer them subsidized administrative services, and/or enter into lucrative captive reinsurance deals with them.

4.     The money to finance the force-placed insurance schemes comes from unsuspecting borrowers who are charged inflated force-placed insurance premiums by lenders. In many instances, borrowers are required to pay for backdated insurance coverage to cover periods during which no claims were made, or coverage that exceeds the legal requirements, and are charged additional improper fees.

5.     The Defendants' force-placed insurance schemes take advantage of the broad discretion afforded the lenders and/or servicers in standard form mortgage agreements.  The agreements typically require the borrower to carry hazard insurance sufficient to cover the lender's interest in the property against fire and other perils.  Some mortgage agreements also

require borrowers to maintain flood insurance on their properties sufficient to cover the lender's risk from flood damage. If a homeowner's hazard or flood policy lapses, the mortgage agreement allows the lender to "force place" a new policy on the property at the borrower's expense.

6. Although force-placed insurance is designed to protect the lender's interest in the property that secures the loan and thus should not exceed that interest, lenders often purchase coverage from their exclusive insurers in excess of that required to cover their own risk. And, as a matter of practice, the major lenders and servicers collude with the two major force-placed insurers to manipulate the force-placed insurance market and artificially inflate the premiums charged consumers, resulting in premiums up to *ten times* greater than those available to the consumer in the open market. *American Banker* reported that "[t]hough part of the extra expense can be explained by the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry— even after accounting for the generous commissions and other payments that servicers demand." *See* J. Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*, AM. BANKER (Nov. 10, 2010), *available at* http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html. Lenders, servicers, and force-placed insurers reap these unconscionable profits entirely at the expense of the unsuspecting borrower.

7. At a recent hearing on force-placed insurance held by the National Association of Insurance Commissioners ("NAIC"), Birny Birnbaum, the foremost expert on the force-placed insurance market, illustrated the staggering growth in profits that Defendants' schemes have reaped in recent years:[2]

---

[2] The following graph is taken from Mr. Birnbaum's presentation to the NAIC on August 9,

## LPI Premiums Have Quadrupled Since 2004

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|------|------------------------------------|----------------------------------|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004-2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC                    13                              August 9, 2012

8.      As illustrated below, Assurant, a named defendant in this action, held 58.6% of the nationwide market share for force-placed insurance in 2011.[3]  Together, Assurant and QBE/Balboa controlled 99.7% of the market in the same year, and held no less than 96.1% between 2004 and 2011.[4]

---

2012.  The presentation is available at:
http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance_presentation_birnbaum.pdf

[3] This graph is taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The presentation is available at:
http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance_presentation_birnbaum.pdf

[4] This graph is taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The presentation is available at:
http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance_presentation_birnbaum.pdf

## Assurant and QBE Are the Market for LPI:

## Countrywide Market Share

| Year | Assurant | QBE/Balboa | Assurant + QBE/Balboa |
|------|----------|------------|----------------------|
| 2004 | 68.2% | 29.8% | 98.0% |
| 2005 | 69.7% | 26.4% | 96.1% |
| 2006 | 79.2% | 19.5% | 98.7% |
| 2007 | 74.0% | 25.4% | 99.4% |
| 2008 | 74.2% | 25.5% | 99.7% |
| 2009 | 57.2% | 42.4% | 99.7% |
| 2010 | 56.2% | 43.5% | 99.7% |
| 2011 | 58.6% | 41.1% | 99.7% |

CEJ LPI Presentation to NAIC                    18                    August 9, 2012

9.      It is no surprise that these Defendants' practices have come under increased

scrutiny in recent years by the government and regulators. For example:[5]

- On March 21, 2013, the New York Department of Financial Services' ("NYDFS"), investigation into force-placed insurance practices "produced a major settlement with the country's largest 'force-placed' insurer, Assurant, Inc. . . . [The settlement] includes restitution for homeowners who were harmed, a $14 million penalty paid to the State of New York, and industry-leading reforms that will save homeowners, taxpayers, and investors millions of dollars going forward through lower rates."[6]  Further, under the Consent Order entered, Assurant and its

[5] The Defendants' practices have also come under increased scrutiny by the courts.  This Court has already certified a Florida class against two of the Defendants here – Wells Fargo Bank and Wells Fargo Insurance Inc. (as well as their exclusive FPI carrier QBE) – on the same practices described here.  *See Williams v. Wells Fargo Bank, N.A.*, Case No. 11-cv-21233 (S.D. Fla.) [D.E. 211].

[6] *See Cuomo Administration Settles with Country's Largest Force-Placed Insurer, Leading Nationwide Reform Effort and Saving Homeowners, Taxpayers, and Investors Millions of Dollars*, Dep't of Fin. Servs., Mar. 21, 2013, *available at*, http://www.dfs.ny.gov/about/press2013/pr1303211.htm.

subsidiaries (including ASIC), are prohibited from paying commissions to any servicers or entity affiliated with a servicer on force-placed insurance policies obtained by the servicer.  *See* Assurant & NYDFS Consent Order, Mar. 21, 2013, at 9.

- The NYDFS held hearings on May 17, 2012 related to the force-placed insurance market.  In his opening statement, the Superintendent of Financial Services Benjamin Lawsky stated that the Department's initial inquiry uncovered "serious concerns and red flags" which included; 1) exponentially higher premiums, 2) extraordinarily low loss ratios, 3) lack of competition in the market, and 4) tight relationships between the banks, their subsidiaries, and insurers.  He went on to state:

> "In sum when you combine [the] close and intricate web of relationships between the banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions…"

- After August 2012 NAIC hearings, the state regulator from Louisiana, James Donelon, referred to the force-placed insurance market as a "monopoly" and stated that stricter regulations may be needed.[7]

10.     Florida has now become the epicenter for these force-placed insurance schemes.

In his presentation to the NAIC, Mr. Birnbaum illustrated the astounding rise in force-placed insurance policies in Florida:[8]

---

7 *See* Zachary Tracer and David Beasley, *U.S. Regulators to Examine Force-Placed Insurance*. BLOOMBERG BUSINESSWEEK, Aug. 10, 2012 *available at*: http://www.businessweek.com/news/2012-08-10/u-dot-s-dot-regulators-to-examine-forced-place-insurance.

8 This graph is taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The presentation is available at: http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance_presentation_birnbaum.pdf

**LPI Premium by State:  Florida Has Become Ground Zero**

|      | 2004  | 2005  | 2006  | 2007  | 2008  | 2009  | 2010  | 2011  |
|------|-------|-------|-------|-------|-------|-------|-------|-------|
| FL   | 10.6% | 10.8% | 13.3% | 17.9% | 22.9% | 34.3% | 36.7% | 35.1% |
| CA   | 20.8% | 19.3% | 21.2% | 23.5% | 24.3% | 14.0% | 11.1% | 10.2% |
| TX   | 10.6% | 10.7% | 8.8%  | 8.7%  | 7.0%  | 5.6%  | 5.6%  | 6.1%  |
| NY   | 3.6%  | 3.6%  | 4.5%  | 4.4%  | 4.3%  | 4.7%  | 5.4%  | 5.6%  |
| IL   | 3.0%  | 3.3%  | 3.9%  | 3.7%  | 3.9%  | 4.4%  | 4.1%  | 4.6%  |
| NJ   | 2.9%  | 2.7%  | 2.9%  | 2.7%  | 2.7%  | 2.9%  | 3.4%  | 4.0%  |
| MI   | 4.2%  | 4.4%  | 4.4%  | 5.8%  | 3.6%  | 2.7%  | 2.2%  | 2.0%  |
| OH   | 3.6%  | 3.8%  | 3.5%  | 2.7%  | 2.4%  | 2.2%  | 2.3%  | 2.9%  |
| GA   | 3.4%  | 3.2%  | 3.2%  | 2.4%  | 2.3%  | 2.3%  | 2.3%  | 2.3%  |
| PA   | 2.6%  | 2.6%  | 2.7%  | 1.8%  | 1.8%  | 1.8%  | 1.7%  | 1.8%  |

CEJ LPI Presentation to NAIC                    15                    August 9, 2012

11.     Furthermore, Assurant, the largest force-placed insurance provider, with approximately 60% of the market, maintains one of its main offices in Miami, Florida. Assurant's actuary department, including its lead actuary, which sets the force-placed rates for the entire country, is housed in the South Florida office.

12.     Defendants' self-dealing and collusion in the force-placed insurance market has caused substantial harm to the named Plaintiffs and the putative class they represent.  This class action seeks to redress that harm on behalf of this class of consumers and to recover all improper costs they have incurred related to the forced placement of hazard and flood insurance by the lenders and mortgage servicers, their affiliates, and their cooperating insurers.

<u>**PARTIES**</u>

<u>**Plaintiffs**</u>

13.     Plaintiff MATTHEW POPKIN is a citizen of the State of Florida.  He is a natural person over the age of 21 and otherwise *sui juris*.

14.     Plaintiff TERRY FREEMAN is a citizen of the State of Louisiana.  He is a natural person over the age of 21 and is otherwise *sui juris*.

15.     Plaintiff DORIS RYAN is a citizen of the State of Florida.  She is a natural person

7

over the age of 21 and otherwise *sui juris*.

**Defendants**

16.     Defendant ASSURANT, INC. is a Delaware corporation with its principal office in New York, New York.  Assurant participates in the force-placed insurance market through its trade name, Assurant Specialty Property, and its business strategy "is to pursue long term growth in lender placed homeowner's insurance []."  Assurant Form 10-K for the fiscal year ending December 31, 2011 at 5.  "The largest product line within Assurant Specialty Property is homeowners insurance consisting principally of fire and dwelling hazard insurance offered through (Assurant Specialty Property's) lender placed program." *Id*.

17.     Upon information and belief, Assurant allows its subsidiaries, including ASIC, to operate their force-placed insurance business under the Assurant Specialty Property trade name.

18.     Defendant AMERICAN SECURITY INSURANCE COMPANY is a Delaware corporation and an indirect subsidiary of Assurant, Inc., writing force-placed insurance policies in all fifty states and the District of Columbia with its principal address in Atlanta, Georgia. American Security often operates under the trade name Assurant Specialty Property.  American Security contracts with the lenders whereby it acts as a force-placed insurance vendor.  Its duties include, but are not limited to, tracking loans in their mortgage portfolio, handling all customer service duties related to force-placed insurance, and securing force-placed insurance policies on properties when a borrower's insurance has lapsed.

19.     Upon information and belief, American Security passes much of its profits from force-placed insurance to its corporate parent Assurant.

20.     Defendant CITIBANK, N.A. is one of the nation's largest banks with its principal place of business in New York, New York. Citibank is engaged in the business of mortgage

lending throughout the United States.

21.     Defendant CITIMORTGAGE, INC. is an affiliate of Citibank with its principal place of business in O'Fallon, Missouri, and services mortgages on behalf of Citibank and other mortgage companies throughout the United States.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

23.     Plaintiffs are citizens of the states of Florida and Louisiana. Defendants are citizens of various other states but are registered to do business in the aforementioned states. The amount in controversy exceeds $5,000,000 and there are at least one hundred members of the putative class.

24.     This Court has subject-matter jurisdiction over Plaintiffs' claims arising under the Bank Holding Company Act, 12 U.S.C. § 1972, *et seq.*, according to the statute's jurisdictional statement, 12 U.S.C. § 1975.

25.     This Court has jurisdiction over Defendants because they are foreign corporations authorized to conduct business in Florida, are doing business in Florida and have registered with the Florida Secretary of State, or do sufficient business in Florida, have sufficient minimum contacts with Florida, or otherwise intentionally avail themselves of the Florida consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

26.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between the Plaintiffs and the Defendants.  28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

27.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District.  Venue is also proper here because at all times relevant hereto, most Plaintiffs resided in the Southern District of Florida and a substantial portion of the practices complained of herein occurred in the Southern District of Florida.

28.     All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

29.     Permitting a lender to forcibly place insurance on a mortgaged property and charge the borrower the full cost of the premium is neither a new concept nor a term undisclosed to borrowers in mortgage agreements.  The standard form mortgage agreements used by most major lenders include a provision requiring the borrower to maintain hazard insurance coverage—and flood insurance coverage if the property is located in a Special Flood Hazard Area as determined by the Federal Emergency Management Agency—on the property securing the loan, and in the event the insurance lapses, permit the lender to obtain force-placed coverage and charge the premiums to the borrower rather than declare the borrow in default.

30.     What is unknown to borrowers and not disclosed in the mortgage agreements is that lenders and loan servicers have exclusive arrangements with certain insurers to manipulate the force-placed insurance market and artificially inflate premiums.  The premiums are inflated

to provide lenders and servicers with kickbacks disguised as "commissions" (usually paid to an affiliate), or provide the lender or servicer (through an affiliate) with lucrative reinsurance arrangements as well as to include unmerited charges. The borrower is then forced to pay the inflated premiums.

### The Force-Placed Insurance Scheme

31.     The Assurant Defendants have an exclusive arrangement with the Citi Defendants to monitor their mortgage portfolio and provide force-placed insurance for borrowers whose voluntary coverage has lapsed. In addition to the subsidized mortgage services they receive from the Assurant Defendants, the Citi Defendants are directly, or through an affiliate, kicked back a percentage of the force-placed premium or compensation through reinsurance arrangements.

32.     The scheme works as follows.   The Citi Defendants purchase master or "umbrella" insurance policies that cover the entire portfolio of mortgage loans that they service. In exchange, the Assurant Defendants are given the exclusive right to force insurance on property securing a loan within the portfolio when the borrower's insurance lapses or the lender/servicer determines the borrower's existing insurance is inadequate.   Assurant or American Security monitors the lender's loan portfolio for lapses in borrowers' insurance coverage.   Once a lapse is identified, Assurant, through American Security, sends notice to the borrower that insurance will be "purchased" and force-placed if the voluntary coverage is not continued.  If a lapse continues, American Security notifies the borrower that insurance is being force-placed at his or her expense.

33.     No individualized underwriting ever takes place for the force-placed coverage. Insurance is automatically placed on the property and the premium charged to the borrower.  In many instances, the insurance lapse is not discovered for months or even years after the fact.

Despite the absence of any claim or damage to the property during the period of lapse, retroactive coverage is placed on the property and the past premiums charged to the borrower.

34.     Once coverage is forced on the property, the Citi Defendants charge the borrower for the insurance premiums by having their exclusive force-placed vendor deduct the cost of the premium from the borrower's mortgage escrow account.  Alternatively, the Citi Defendants may add the charge to the balance of the borrower's loan.[9]

35.      The Citi Defendants then pay the premium to Assurant or ASIC, which kicks back a set percentage of the premium to the Citi Defendants or a Citi affiliate as a "commission."

36.     The money kicked back to the Citi Defendants or a Citi affiliate is not given in exchange for any services provided in connection with the placement of new insurance coverage; it is simply grease paid to keep the force-placed machine moving.  In an attempt to mask the kickback as legitimate, the insurer discloses to the borrower that the affiliate may receive a "commission" or "compensation" for helping to procure a force-placed policy.   In reality, however, no work is ever done by the affiliate to procure insurance for that particular borrower because the coverage comes through the master or umbrella policy already in place.

37.     Under this highly profitable force-placed insurance scheme, the Citi Defendants are incentivized to purchase and force place  insurance coverage carrying inflated premiums  on a borrower's property because the higher the cost of the insurance policy, the higher the kickback.

38.     The Assurant Defendants also enter into agreements to perform servicing activities on the Citi Defendants' entire loan portfolio at below cost.  For example, Assurant or ASIC monitors the Citi Defendants' mortgage portfolio to identify borrowers whose insurance

---

[9] On some occasions when a borrower does not have an escrow account, the lender creates an escrow account with a negative balance and charges the borrower to bring the balance to zero.

has lapsed and notify borrowers of their obligation to maintain insurance. These tasks are the Citi Defendants' job as a mortgage servicer, and they receive payment for these services from the mortgage owner (often Fannie Mae or Freddie Mac). The servicing costs are added into the force-placed premiums which are then passed on to the borrower. The insurers are able to provide these services below cost because of the enormous profits they make from the hyper-inflated premiums charged for force-placed insurance. However, because insurance-lapsed mortgaged property comprises only 1-2% of the lenders' total mortgage portfolio, the borrowers who pay these premiums unfairly bear the entire cost to service the entire loan portfolio. The mortgage servicer saves money on servicing the mortgage and receives a kickback of force-placed insurance premiums, the insurance provider is paid to service the mortgage and provide the insurance, and the borrower pays all the costs.

39.     The Assurant Defendants also enter into essentially riskless "captive reinsurance arrangements" with lenders such as the Citi Defendants and their affiliates to "reinsure" the property insurance force-placed on borrower. A recent *American Banker* article detailed this reinsurance problem with respect to JP Morgan Chase Bank:

> JPMorgan and other mortgage servicers' reinsure the property insurance they buy on behalf of mortgage borrowers who have stopped paying for their own coverage. In JPMorgan's case, 75% of the total force-placed premiums cycle back to the bank through a reinsurance affiliate. This has raised further questions about the force-placed market's arrangements. Over the last five years, Chase has received $660 million in reinsurance payments and commissions on force-placed policies, according to New York's DFS.
>
> Of every hundred dollars in premiums that JPMorgan Chase borrowers pay to Assurant, the bank ends up keeping $58 in profit, DFS staff asserted. The agency suggested the bank's stake in force-placed insurance may encourage it to accept unjustifiably high prices by Assurant and to avoid filing claims on behalf of borrowers, since that would lower its reinsurer's returns. The DFS staff also questioned the lack of competition

> in the industry, noting that Assurant and QBE have undertaken acquisitions that give them long-term control of 90% of the market. Further limiting competition are the companies' tendency to file identical rates in many states, Lawsky and his staff argue.

J. Horwitz, *Chase Reinsurance Deals Draw New York Regulator's Attacks*, AM. BANKER, (May 18, 2012), available at http://www.americanbanker.com/issues/177_97/chase-reinsurance-deals-regulator-attack-1049460-1.html.

40.   The Citi Defendants may also overcharge borrowers by disregarding the Standard Mortgage Clause or the Lender's Loss Payable Endorsement ("LLPE") in the standard form mortgage agreement.  Either of these clauses typically protects the lender for a period of at least ten days after the termination of the homeowner's voluntary insurance policy.  Force-placed policies, however, take effect on the date of termination, and "double-cover" the property unnecessarily during the period covered by the LLPE or Standard Mortgage Clause.  This means the borrower is charged for coverage for which the lender or servicer has no exposure.

41.   Ultimately it is the unsuspecting borrower who suffers the consequences of these unconscionable practices.[10]

## The Plaintiffs

42.   The actions and practices described above are unconscionable and done in bad faith with the sole objective to maximize profits.  Borrowers who for whatever reason have stopped paying for insurance or are under-insured on mortgaged property are charged hyper-inflated and illegitimate non-competitive "premiums" for force-placed insurance that include undisclosed kickbacks to the Defendants or their affiliates (who, as described above, perform little to no functions related to the force-placement of the individual policies), as well as the cost

---

[10] Furthermore, when the cost of the inflated premium is added by the Defendants to a homeowner's mortgage balance, it thereby increases the interest paid over the life of the loan by the homeowner to the lender.

of captive reinsurance arrangements and administrative services.

43.     Plaintiffs here do not challenge the Citi Defendants' right to force place insurance in the first instance.  They challenge Defendants' manipulation of the force-placed insurance market with an eye toward artificially inflating premiums and placing unnecessary coverage, which the Citi Defendants purchase from the Assurant Defendants and then choose to pass on to the borrower.  This action is brought to put an end to Defendants' exclusive, collusive, and uncompetitive arrangements, and to recover for Plaintiffs the excess amounts charged to them beyond the true cost of insurance coverage.

### A.   **Plaintiff Matthew Popkin**

44.     Plaintiff Matthew Popkin is the owner of a residential property located in Broward County, Florida.

45.     In October 2007, Mr. Popkin secured his original mortgage with ABN AMRO Mortgage Group, Inc.  Upon information and belief, Citibank became the Successor by Merger to ABN AMRO Mortgage Group, Inc.  Pursuant to the merger, Citimortgage subsequently became the mortgage servicer for Mr. Popkin's mortgage.

46.     Mr. Popkin's mortgage agreement provides:

> **5. Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which the Lender requires insurance.  The insurance shall be maintained in the amounts … and for the periods that Lender requires.
>
> ***
>
> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower … against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage

15

so obtained might significantly exceed the cost of insurance that Borrower could have obtained.

47.     On or around the time that Mr. Popkin executed his mortgage, he obtained a homeowner's insurance policy with Citizens Property Insurance Corporation.  Said policy was comprehensive and covered not only the property, but also the personal property within the home.  The premium for Mr. Popkin's policy was approximately $4,600 a year.

48.     At all times during 2007 and 2008, the Citizens policy was in place. Mr. Popkin provided Citimortgage with proof of coverage of his policy with Citizens.

49.     Unbeknownst to Mr. Popkin, on October 1, 2008, the Citi Defendants forced an insurance policy on his property with Assurant's subsidiary, American Security.  The policy provided $600,000 in coverage, and had a premium of $11,524.10 per year. It covered the dwelling but provided no contents coverage. The policy's effective date was June 28, 2008, more than 3 months prior to the date the Citi Defendants purchased it. Mr. Popkin's mortgage's principal balance was $417,000 as of October 1, 2008.

50.     Mr. Popkin received no notice whatsoever of the force-placed policy and continued making his monthly mortgage payments through an automatic draft against his bank account. The Citi Defendants, however, increased the amount of his monthly mortgage payments to pay for their force-placed insurance charges. Mr. Popkin paid the increased mortgage payments.

51.     Had Mr. Popkin known that such a policy was placed on his property, he would have certainly advised the Citi Defendants of their error and would have re-sent proof of his coverage with Citizens.

52.     Accordingly, Mr. Popkin was unknowingly paying for two insurance policies on his property from October 1, 2008 through September of 2009.

53.     In September 2009, and unbeknownst to Mr. Popkin, his policy with Citizens lapsed.

54.     On or around late December 2009, Citimortgage forced a property insurance policy, again underwritten by American Security, without first advising Mr. Popkin of same. This force-placed policy was not only inferior in coverage to his previous policy with Citizens in that it only covered the structure, but was also considerably more expensive than his premium with Citizens or those premiums offered on the open market.

55.     The premium for the force-placed policy was $16,480.80 and was backdated to September of 2009 when the Citizens policy lapsed. The policy provided $857,000 in coverage. Mr. Popkin's mortgage's principal balance was $417,000 as of December 2009.

56.     Not only did the Citi Defendants fail to advise Mr. Popkin that they were going to force an insurance policy on his residence, but on March 15, 2011, they also debited $5,585.20 from his checking account to cover not only his regular mortgage payment (of $2,041.56), but also a portion of the six months of retroactive premiums without his knowledge or permission.

57.     Mr. Popkin first noticed that something was amiss when he received notice from his bank that his account had been overdrawn.  He immediately contacted Citimortgage and was advised that it had obtained a "force-placed" insurance policy on his property with a yearly premium of $16,480.80. When Plaintiff asked 1) why he was not given notice and 2) why the premium was so high, he was told that "they could charge whatever they wanted."

58.     Three days later, Mr. Popkin obtained a new policy with Tower Hill Insurance. He immediately provided notice to the Citi Defendants and was told that the policy with American Security would be canceled.   However, Mr. Popkin's monthly payments were increased by $177.00 to cover the remaining costs associated with the force-placed policy.

59.     Notwithstanding that Mr. Popkin had obtained a policy with Tower Hill and was advised that the force-placed policy was cancelled, on March 19, 2011, Citimortgage again debited $5,585.20 from his bank account without his knowledge or permission.  Citimortgage advised that it apparently made a mistake and reversed the charge.

60.     On April 27, 2010, Mr. Popkin received notice that Tower Hill had cancelled his policy due to issues with his screen fence.  He immediately began looking for a new carrier, but was unsuccessful for several months.

61.     On or about August 7 2010, Citimortgage sent Mr. Popkin a notice wherein it stated that it had force-placed another policy on his property with American Security. Its effective date was May 19, 2010, nearly three months prior to the date Citimortgage purchased the policy.  The cost of the force-placed policy was $22,319.10, and it provided $1,162,000 in coverage. Mr. Popkin's mortgage's principal balance was $417,000 as of August 7, 2010.

62.     In December 2011, Mr. Popkin purchased an insurance policy with American Platinum Property and Casualty Insurance Company.  Mr. Popkin's sister notified Citimortgage of this policy and faxed Citimortgage a copy of the declaration page for the policy.  The annual premium for the policy was $9,000.00.  Not only is said policy reflective of the prices available on the open market, but it also includes coverage for, *inter alia*, the structure, personal property, personal liability, loss of use, and medical payments.  Upon information and belief, the Citi Defendants have to date failed to cancel the force-placed policy with American Security despite Mr. Popkin's acquisition of a voluntary policy.

63.     In addition to the force-placed hazard insurance on Mr. Popkin's property, Citimortgage has retroactively placed flood insurance, also through American Security, multiple times notwithstanding that there has never been a lapse in his flood insurance.

64.     On August 27, 2010, Citimortgage force-placed $250,000 in flood insurance coverage on Mr. Popkin's property. The effective date was June 28, 2010, two months prior to the date Citimortgage purchased the policy. The premium for the policy was $2,250, and Citimortgage charged Mr. Popkin $2,304 in total force-placed insurance charges. Mr. Popkin's mortgage's principal balance was $417,000 as of August 27, 2010.

65.     On July 7, 2011, Citimortgage again force-placed $250,000 in flood insurance coverage on Mr. Popkin's property. The effective date was June 28, 2011, nine days prior to the date Citimortgage purchased the policy. The premium for the policy was $2,250, and Citimortgage charged Mr. Popkin $2,304 in total force-placed insurance charges. Mr. Popkin's mortgage's principal balance was $417,000 as of July 7, 2011.

66.     Citimortgage never notified Mr. Popkin that it had force-placed flood insurance on his property.

67.     Citimortgage charged the premiums for these force-placed flood insurance policies to Mr. Popkin's mortgage and required him to increase his monthly mortgage payments. Mr. Popkin increased his monthly mortgage payments to pay for these charges.

68.     Mr. Popkin already maintained $250,000 in flood insurance (the federal maximum for flood insurance) through Nationwide Mutual Fire Insurance Company. Mr. Popkin's voluntary flood insurance coverage, in contrast to the Citi Defendants' force-placed insurance coverage, provided $250,000 in building coverage and $5,900 in contents coverage and cost only $351 in premium, or about 15% as much as Citimortgage's force-placed coverage. Citimortgage's force-placed insurance was six times more expensive than Mr. Popkin could obtain on the open market. Citimortgage was listed as additional named insured on the face of each year's flood insurance policy.

69.     Citimortgage, or one of its affiliates, received a portion of the force-placed insurance charges for each of Mr. Popkin's force-placed flood and hazard insurance charges.

70.     Upon information and belief, the Citi Defendants have failed to cancel the flood insurance on Mr. Popkin's property even after being provided with proof of coverage.

71.     There is no material difference between the Citi Defendants' actions and practices directed to Mr. Popkin and Defendants' actions and practices directed to the Class Members.

**B.     Plaintiff Doris Ryan**

72.     Plaintiff Doris Ryan is a retiree residing in the city of St. Cloud in Osceola County, Florida.

73.     Ms. Ryan had a home equity line of credit with a maximum line of credit of $75,000 serviced by Citibank, FSB until it merged with Citibank, N.A.

74.     Ms. Ryan's HELOC mortgage provides:

4.     **Hazard Insurance.** You shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and such other hazards as We may require (including flood insurance coverage, if required by Us) and in such amounts and for such periods as We may require. Unless We require in writing otherwise, the policy shall provide insurance on a replacement cost basis in an amount not less than necessary to comply with any coinsurance percentage stipulated in the hazard insurance policy. All insurance policies and renewals thereof shall be in form and substance and with carriers acceptable to Us and shall include a standard mortgage clause in favor of and in form and substance satisfactory to us

6.     **Protection of Our Security.** If You fail to perform Your obligations under this Mortgage, or if any action or proceedings adversely affects our interest in the Property, We may, at Our option, take any action reasonably necessary (including, without limitation, paying expenses and attorney fees and to have entry upon the Property to make repairs) to perform Your obligations or to protect Our interests. Any amounts disbursed by Us pursuant to this Paragraph 6 with interest thereon at the variable rate described in the Agreement, shall become indebtedness secured by this Mortgage (except as expressly provided herein). Nothing contained in this Paragraph 6 shall require Us to incur any expense or take any action hereunder.

75.     Nowhere does Ms. Ryan's HELOC explicitly authorize the Citi Defendants to force-place insurance for Ms. Ryan's home, or provide any guidance on how they could be authorized to act with respect to purchasing insurance on Ms. Ryan's behalf. Instead, Section 6, quoted above, reserves to the Citi Defendants the right to "take any action reasonably necessary . . . to perform [Ms. Ryan's] obligations or to protect [the Citi Defendant's] interests."

76.     Because the contract is silent with respect to force-placed insurance, Ms. Ryan brings numerous tort and statutory claims against the Citi Defendants based on their or their affiliates' receipt of kickbacks in the purchase of force-placed insurance for her home, as outlined below. The gravamen of Ms. Ryan's contractual claims is that it was not "reasonably necessary," as quoted from her HELOC above, for the Citi Defendants to receive a kickback for purchasing force-placed insurance for Ms. Ryan's home from ASIC.

77.     As of February 10, 2010, Ms. Ryan's balance on her HELOC was $14,536.44 and she voluntarily maintained $144,100 in flood insurance coverage. The replacement cost value of Ms. Ryan's home, as listed on the face of her flood insurance policy, was $144,100.

78.     Beginning in 2009 and early 2010, the Citi Defendants began requesting proof of Ms. Ryan's flood insurance coverage.

79.     On November 26, 2009, the Citi Defendants purchased a $75,000 force-placed flood insurance policy for Ms. Ryan's Home from ASIC. It charged $691.20 to her HELOC, adding this amount to her HELOC principal balance.

80.     Ms. Ryan sent the Citi Defendants proof of her existing voluntary flood insurance policy, and they cancelled the charge for the November 26, 2009 force-placed flood insurance policy.

81.     In early 2010, the Citi Defendants sent letters to Ms. Ryan stating that her existing flood insurance coverage was insufficient and that she needed to increase her flood insurance coverage by an additional $16,900 to $160,000 in total coverage, which was $85,000 more than the maximum line of credit on her HELOC.

82.     On or about March 28, 2010, the Citi Defenants purchased a $16,900 force-placed flood insurance policy for Ms. Ryan's home from ASIC. They charged $157 to her HELOC to pay ASIC's force-placed insurance charges and added this amount to her HELOC balance.

83.     The Citi Defendants, or one of their subsidiaries or affiliates, received a portion of this $157 as a kickback.

84.     Ms. Ryan continued to make her monthly HELOC payments. A portion of her monthly payment was used to pay these force-placed insurance charges.

85.     In 2011, the Citi Defendants purchased another $75,000 force-placed flood insurance policy for Ms. Ryan's property and charged her HELOC $691.20. Ms. Ryan again sent proof of her $144,100 voluntary flood insurance policy and they cancelled this charge.

86.     On or about May 7, 2011, however, the Citi Defendants purchased a $16,900 force-placed flood insurance policy for Ms. Ryan's home from ASIC. They charged $157 to her HELOC to pay ASIC's force-placed insurance charges and added this amount to her HELOC balance.

87.     The Citi Defendants, or one of their subsidiaries or affiliates, received a portion of this $157 as a kickback.

88.     ASIC's force-placed insurance charges were inflated by kickbacks paid to the Citi Defendants, or their affiliate, and by compensation to ASIC for below-cost insurance monitoring services it provided to the Citi Defendants.

89.     Ms. Ryan withdrew money from her 401(k) retirement plan and paid off her HELOC in full, including all unpaid charges for force-placed insurance.

90.     There is no material difference between the Defendants' actions and practices directed to the Ms. Ryan and Defendants' actions and practices directed to the Class Members.

**C.      Plaintiff Terry Freeman**

91.     Plaintiff Terry Freeman owns his home in Franklin, Louisiana.

92.     Citimortgage services Mr. Freeman's mortgage on behalf of Citibank.

93.     Mr. Freeman's mortgage is a standard, uniform Federal Housing Administration (FHA) mortgage, which provides:

> **4.      Fire, Flood and Other Hazard Insurance**. Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

> **7.      Charges to Borrower and Protection of Lender's Rights in the Property.** . . . . If Borrower fails to . . . perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the property, including payment of taxes, hazard insurance and other items mentioned in paragraph 2.

> Any amounts disbursed by Lender under this paragraph shall become an additional debt of Borrower and be secured by this Security Instrument. These amounts shall bear interest from the date of disbursement at the Note rate, and at the option of Lender shall be immediately due and payable.

23

94.     Nowhere does Mr. Freeman's mortgage explicitly authorize Citimortgage to force-place insurance for Mr. Freeman's home, or provide any guidance on how Citimortgage could be authorized to act with respect to purchasing insurance on Mr. Freeman's behalf. Instead, Section 7, quoted above, reserves to Citimortgage the right to "do and pay whatever is necessary to protect the value of the Property and Lender's rights in the property, including payment of taxes, hazard insurance and other items . . ." and to "collect fees and charges authorized by the Secretary" of Housing and Urban Development.

95.     Because the contract is silent with respect to force-placed insurance, Mr. Freeman brings numerous tort and statutory claims against the Citi Defendants based on their or their affiliates' receipt of kickbacks in the purchase of force-placed insurance for his home, as outlined below. The gravamen of Mr. Freeman's contractual claims is that it is not "necessary," as quoted from his mortgage above, for the Citi Defendants to receive a kickback for purchasing force-placed insurance for Mr. Freeman's home from ASIC, nor are these kickbacks "fees or charges authorized by the Secretary" of Housing and Urban Development.

96.     Citimortgage force-placed Mr. Freeman into both hazard insurance and flood insurance from 2009 through the present.

97.     Citimortgage force-placed Mr. Freeman into hazard insurance for the first time on February 24, 2009. It purchased this policy from ASIC, and the policy provided $72,800 in hazard insurance coverage. It renewed this force-placed insurance policy in 2010, 2011, and 2012. Each year, it charged approximately $1,220.83 to Mr. Freeman's escrow account.

98.     Citimortgage force-placed Mr. Freeman into flood insurance for the first time on February 3, 2010. It purchased this policy from ASIC, and the policy provided $70,555 in flood

insurance coverage. It renewed this force-placed insurance policy in 2011 and 2012. Each year, it charged approximately $1094 to Mr. Freeman's escrow account.

99.     Mr. Freeman paid these force-placed insurance charges each month when he made his monthly mortgage payment. These force-placed insurance charges increased Mr. Freeman's monthly mortgage payment to compensate for the deficiency in Mr. Freeman's escrow account caused when Citimortgage withdrew force-placed insurance charges from Mr. Freeman's escrow account.

100.    The Citi Defendants or one of their affiliates received a portion of each force-placed insurance charge as a "commission." The rest was paid to ASIC.

101.    The Citi Defendants or one of their affiliates received an additional portion of these force-placed insurance charges in premiums for "reinsurance" paid by ASIC to the Citi Defendants or their affiliate.

102.    ASIC's force-placed insurance charges were inflated by kickbacks paid to the Citi Defendants, or their affiliate, and to compensate ASIC for below-cost insurance monitoring services it provided.

103.    There is no material difference between Defendants' actions and practices directed to Mr. Freeman and their actions and practices directed to the Class.

<u>**CLASS ALLEGATIONS**</u>

**A.  Class Definitions**

104.    Plaintiffs bring this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated. Plaintiffs seek to represent the following classes:

Nationwide Class

Plaintiffs Matthew Popkin, Terry Freeman, and Doris Ryan represent:

> All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard or flood insurance policy placed on property, through the Citi Defendants and/or these companies' affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

Florida Subclass as to Count V – Florida Deceptive and Unfair Trade Practices Act against Citimortgage:

Plaintiffs Matthew Popkin and Doris Ryan represent:

> All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard or flood insurance policy placed on property within the State of Florida, through the Citi Defendants and/or these companies' affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

105.    Plaintiffs reserve the right to modify or amend the definitions of the proposed class and subclass before the Court determines whether certification is appropriate.

106.    Defendants subjected Plaintiffs and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

**B.    Numerosity**

107.    The proposed classes are so numerous that joinder of all members would be impracticable.  Defendants sell and service millions of mortgage loans and force-place millions of insurance policies in the states of Florida and Louisiana, as well as nationwide.  The individual class members are ascertainable, as the names and addresses of all class members can be identified in the business records maintained by Defendants.  The precise number of class members numbers at least in the thousands and can only be obtained through discovery, but the

numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.   Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

**C.    Commonality**

108.      There are questions of law and fact that are common to all Plaintiffs' and class members' claims.  These common questions predominate over any questions that go particularly to any individual member of the Class.  Among such common questions of law and fact are the following:

a.   Whether Defendants charged borrowers for unnecessary insurance coverage including, but not limited to, insurance coverage that exceeded the amount required by law or the borrowers' mortgages and/or backdated coverage that covered periods of time for which Defendants had no risk of loss;

b.   Whether the Citi Defendants breached the mortgage contracts with Plaintiffs and the nationwide class by charging them for force-placed insurance that included illegal kickbacks (including unwarranted commissions and reinsurance payments) and by charging Plaintiffs and the Class for servicing their loans;

c.   Whether Defendants have been unjustly enriched at the expense of the Plaintiffs and the nationwide class;

d.   Whether the Citi Defendants breached the implied covenant of good faith and fair dealing by entering into exclusive arrangements with selected insurers and/or their affiliates, which resulted in inflated insurance premiums being charged to Plaintiffs and the nationwide class;

e.   Whether the Defendants manipulated forced-placed insurance purchases in order to maximize their profits to the detriment of Plaintiffs and the Class;

f.   Whether affiliates of the Citi Defendants or the Citi Defendants themselves perform any work or services in exchange for the "commissions" or other "compensation" they collect;

g.   Whether the premiums charged are inflated to include kickbacks and unwarranted "commissions;"

h.   Whether the premiums charged are inflated to include charges for bundled

administrative services that the vendors provide to the lenders or mortgage servicers, and which are not chargeable to Plaintiffs and the Class under the terms of their mortgages;

i.  Whether the premiums charged are inflated to include the cost of a captive reinsurance arrangement;

j.  Whether the Citi Defendants violated TILA by conditioning their extensions of credit on the purchase of insurance through an affiliate, in direct contravention of the anti-coercion disclosures included in borrowers' mortgages;

k.  Whether the Citi Defendants violated TILA by failing to disclose kickbacks charged to class members in their mortgages;

l.  Whether Citibank violated the anti-tying provisions of the federal Bank Holding Company Act by tying its agreement to purchase insurance on behalf of class members, and their continuing extensions of credit, on class members agreeing that they could purchase insurance through their affiliate;

m.  Whether an objective consumer would be deceived by Citimortgage's arrangement, which incentivizes Defendants to charge inflated fees for force-placed insurance, and therefore violates Florida's Deceptive and Unfair Trade Practices law;

n.  Whether Assurant and/or American Security intentionally and unjustifiably interfered with the Plaintiffs' and the nationwide class's rights under the mortgage contracts by paying kickbacks to the lenders/mortgage servicers or their affiliates and by charging for administering the loan portfolio; and

o.  Whether Plaintiffs and the Class members are entitled to damages and/or injunctive relief as a result of Defendants' conduct.

**D.  Typicality**

109.  Each Plaintiff is a member the class he or she seeks to represent.  Plaintiffs' claims are typical of the respective classes' claims because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct.  Each class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

### E.      Adequacy of Representation

110.    Each Plaintiff is an adequate representative of the class he or she seeks to represent and will fairly and adequately protect the interests of that class.   Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them.   There is no hostility between Plaintiffs and the unnamed class members.   Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

111.    To prosecute this case, Plaintiffs have chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

### F.      Requirements of Fed. R. Civ. P. 23(b)(3)

112.    The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class.   All claims by Plaintiffs and the unnamed class members are based on the force-placed insurance policies that Defendants unlawfully secured and their deceptive and egregious actions involved in securing the force-placed policy.

113.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

114.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

G.     **Superiority**

115.     A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

> (a) Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside all across the states;

> (b) Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake.  As a result, individual class members have no interest in prosecuting and controlling separate actions;

> (c) There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

> (d) The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

> (e) Individual suits would not be cost effective or economically maintainable as individual actions; and

> (f) The action is manageable as a class action.

H.     **Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

116.     Prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

117.     Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I

## BREACH OF CONTRACT
### (All Plaintiffs against the Citi Defendants)

118.    Plaintiffs Matthew Popkin, Doris Ryan, and Terry Freeman re-allege and incorporate paragraphs 1-117 above as if fully set forth herein and further allege as follows.

119.    Plaintiffs and all similarly situated class members have mortgages that are owned and/or serviced by the Citi Defendants.

120.    Plaintiffs and these class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding force-placed insurance requirements and its placement by the Citi Defendants.  The force-placed provisions from Plaintiffs' mortgage contracts are described above in paragraphs 46, 74, and 93.

121.    Plaintiffs' mortgages require that they maintain insurance on their properties and provide that if they fail to do so, then the lender may obtain insurance coverage to protect its interest in the property, "force place" the coverage, and charge the borrower the cost.

122.    The Citi Defendants charge borrowers premiums that include unearned "commissions" or kickbacks to Citi or a Citi affiliate, reinsurance premiums, as well as bundled administrative and other impermissible costs.  These costs are not costs of coverage, and are not applied to protecting the Citi Defendants' rights or risk in the collateral for borrowers' mortgage loans.  The Citi Defendants breached the mortgage agreements by, among other things, charging Plaintiffs and class members the amounts beyond the actual cost of coverage.

123.    The Citi Defendants have also breached Plaintiffs' and the class members' mortgage agreements by charging Plaintiffs and the class for excess and unnecessary force-placed insurance coverage, including retroactive coverage, as such coverage does not protect the Citi Defendants' rights in their collateral or cover their risk.

31

124.    Plaintiffs and the Class members have suffered damages as a result of the Citi Defendants' breaches of contract.

**WHEREFORE**, Plaintiffs Popkin, Ryan, and Freeman, on behalf of themselves and all similarly situated Class members, seek compensatory damages resulting from the Citi Defendants' breach of contract, as well as injunctive relief preventing them from further violating the terms of the mortgages.  Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

<u>COUNT II</u>

<u>BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING</u>
<u>(Plaintiffs Matthew Popkin, Terry Freeman, and Doris Ryan against the Citi Defendants)</u>

125.    Plaintiffs Popkin, Freeman, and Ryan re-allege and incorporate paragraphs 1-117 above as if fully set forth herein and further allege as follows.

126.    A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance.  Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

127.    Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

128.    Plaintiffs and the Class members' mortgage contracts allow the mortgage servicer to force place an insurance policy on the borrower's property in the event of a lapse in coverage, but do not define standards for selecting an insurer or procuring an insurance policy.

129.    The Citi Defendants have substantial discretion in force placing insurance coverage.  They are permitted to unilaterally choose the company from which they purchase force-placed insurance and negotiate a price for the coverage they procure.  The servicers have

an obligation to exercise the discretion afforded them in good faith, and not capriciously or in bad faith. Plaintiffs do not seek to vary the express terms of the mortgage contract, but only to insure that the Defendants exercise their discretion in good faith.

130.    The Citi Defendants breached the implied covenant of good faith and fair dealing by, among other things:

(a) Manipulating the force-placed insurance market by selecting insurers (here, Assurant and ASIC) that would artificially inflate premiums to include kickbacks to the Citi Defendants and/or their affiliate(s) and issue excess insurance coverage not necessary to cover the Citi Defendants' risk, and by failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby insurance coverage is routinely purchased from Assurant and ASIC without seeking a competitive price;

(b) Assessing inflated and unnecessary insurance policy premiums against Plaintiffs and the Class and misrepresenting the reason for the cost of the policies;

(c) Collecting a percentage or allowing their affiliates to collect a percentage of whatever premiums are charged to Plaintiffs and the Class and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced force-placed insurance policies possible;

(d) Charging Plaintiffs and the Class for commissions when the insurance is prearranged and no commission is due;

(e) Charging Plaintiffs and the Class an inflated premium due to captive reinsurance arrangements;

(f) Charging Plaintiffs and the Class for having the vendor perform the Citi Defendants' obligation of administering their mortgage portfolio, which is not chargeable to Plaintiffs or the Class;

(g) Force placing flood insurance coverage in excess of what is required by law or borrowers' mortgage agreements; and

(h) Force placing insurance coverage in excess of that required to cover the lender's interest in the property, or the balance owed on the loan.

131.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class have suffered damages.

**WHEREFORE**, Plaintiffs Popkin, Freeman, and Ryan, on behalf of themselves and similarly situated Class members, seek a judicial declaration determining that the premiums charged and the terms of the force-placed insurance policies violate the duties of good faith and fair dealing.  Plaintiffs also seek compensatory damages resulting from the Citi Defendants' breaches of their duties.  Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

**COUNT III**

**UNJUST ENRICHMENT**
**(All Plaintiffs against the Citi Defendants)**[11]

132.    Plaintiffs re-allege and incorporate paragraphs 1-117 above as if fully set forth herein and further alleges as follows.

133.    The Citi Defendants received from Plaintiffs and Class members benefits in the form of inflated insurance premiums related to force-placed insurance policies, unwarranted kickbacks and commissions, captive reinsurance arrangements, and subsidized loan servicing costs.

134.    These Defendants entered into an agreement whereby the insurance vendor— here, Assurant's subsidiary, American Security—would provide force-placed insurance policies to the Citi Defendants for the portfolio of loans monitored on behalf of the Citi Defendants.  The Citi Defendants would then charge Plaintiffs and the Class premiums that had been artificially inflated to include costs not properly chargeable to the borrower.  The force-placed policies imposed on borrowers were therefore far more expensive than those available to borrowers in the open market that provide even more coverage.

---

[11] Plaintiffs plead their unjust enrichment claim against the Citi Defendants in the alternative to their contractual claims against them.

135.    These Defendants also collected premiums on force-placed policies that provided coverage in excess of that required by law or the borrowers' mortgage agreement, and in excess of that required to protect the lender's interest in its collateral.

136.    The Assurant Defendants paid and collected significant monies in premiums, kickbacks, commissions, and reinsurance tied directly to the cost of the force-placed insurance premium (as a percentage).  Commissions or kickbacks were paid directly to the Citi Defendants in order to be able to exclusively provide force-placed insurance policies.  The Assurant Defendants were mere conduits for the delivery of the kickbacks, "commissions," and other charges to the Citi Defendants.

137.    These payments directly benefitted the Citi Defendants and were taken to the detriment of the borrower.  The kickbacks and commissions, reinsurance arrangements, and subsidized costs were subsumed into the price of the insurance premium and ultimately paid by the borrower.  Therefore, these Defendants had the incentive to charge and collect unreasonably inflated prices for the force-placed policies.

138.    Further, the Citi Defendants received financial benefits in the form of increased interest income, duplicative insurance based upon the Lender Loss Payable Endorsement or the Standard Mortgage Clause, and/or "soft-dollar" credits.

139.    As a result, Plaintiffs and the Class have conferred a benefit on the Citi Defendants.

140.    These Defendants had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them.

141.    These Defendants will be unjustly enriched if they are allowed to retain the aforementioned benefits, and each class member is entitled to recover the amount by which these

Defendants were unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, demand an award against the Citi Defendants in the amounts by which these Defendants have been unjustly enriched at Plaintiffs' and the Class Members' expense, and such other relief as this Court deems just and proper.

## COUNT IV

### UNJUST ENRICHMENT
### (All Plaintiffs against Assurant and American Security)

142.     Plaintiffs re-allege and incorporate paragraphs 1-117 above as if fully set forth herein and further allege as follows.

143.     The Assurant Defendants received from Plaintiffs and Class members benefits in the form of insurance premiums related to force-placed insurance policies.

144.     The Assurant Defendants paid significant monies to the Citi Defendants in kickbacks, commissions, and reinsurance tied directly to the cost of the force-placed insurance premium (as a percentage).  Commissions or kickbacks were paid directly to the Citi Defendants in order to be able to exclusively provide force-placed insurance policies and receive the corresponding insurance premiums.

145.     The Citi Defendants also collected premiums on force-placed policies that provided coverage in excess of that required by law or the borrowers' mortgage agreement, and in excess of that required to protect the lender's interest in its collateral.

146.     On information and belief, the Assurant Defendants deducted the excess premiums directly from borrowers' escrow accounts.  In the alternative, the Citi Defendants were mere conduits for the delivery of insurance premiums to the Assurant Defendants.

147.     As a result, Plaintiffs and the Class have conferred a benefit on the Assurant

Defendants.

148.    These Defendants had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them.

149.    These Defendants will be unjustly enriched if they are allowed to retain the aforementioned benefits, and each class member is entitled to recover the amount by which these Defendants were unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, demand an award against the Assurant Defendants in the amounts by which these Defendants have been unjustly enriched at Plaintiffs' and the Class Members' expense, and such other relief as this Court deems just and proper.

## COUNT V

### VIOLATION OF THE FLORIDA
### DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (Plaintiffs Matthew Popkin and Doris Ryan against Citimortgage)

150.    Plaintiffs Popkin and Ryan re-allege and incorporate paragraphs 1-117 above as if fully set forth herein and further allege as follows.

151.    FDUTPA, section 501.201, *et seq.*, Florida Statutes, prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  § 501.204, Fla. Stat.

152.    Plaintiffs Popkin and Ryan and the Florida Subclass are "consumers" as that term is defined in section 501.203(7), Florida Statutes.

153.    Citimortgage has engaged in, and continues to engage in, unconscionable acts or practices and used unfair or deceptive acts in the conduct of its trade and/or commerce in the State of Florida.

154.    The policies, acts, and practices alleged herein were intended to result and did result in the payment of inflated premiums for force-placed insurance by Plaintiffs and the Florida Subclass, which in turn were intended to generate unlawful or unfair compensation for Citimortgage.

155.    Specifically, Citimortgage had an exclusive relationship with its vendor and preferred insurance carrier, whereby it would pay unreasonable and inflated premiums for force-placed insurance policies, charge those amounts to the above-named Plaintiffs and the Florida Subclass, and then receive compensation through either kickback or captive reinsurance arrangements based on a percentage of the insurance policy's premium.

156.    Citimortgage's conduct of charging an inflated premium for their force-placed insurance to Plaintiffs Popkin and Ryan and class members violates FDUTPA and was conceived, devised, planned, implemented, approved, and executed within the State of Florida, which has an interest in prohibiting violations of FDUTPA.

157.    Citimortgage is a mortgage servicer and not a bank or savings and loan association regulated by the Florida Office of Financial Regulation of the Financial Services Commission.  Further, Citimortgage is not a bank or savings and loan association regulated by federal agencies.

158.    The above-named Plaintiffs and the Florida Subclass sustained damages as a direct and proximate result of Citimortgage's unfair and unconscionable practices.  Section 501.211(2), Florida Statutes provides these Plaintiffs and the Florida Subclass a private right of action against Citimortgage and entitles them to recover their actual damages, plus attorneys' fees and costs.

159.    These Plaintiffs and the Florida Subclass have suffered and will continue to suffer

irreparable harm if Citimortgage continues to engage in such deceptive, unfair, and unreasonable practices.

**WHEREFORE,** Plaintiffs Popkin and Ryan, on behalf of themselves and the Florida Subclass, demand judgment against Citimortgage for compensatory damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

### COUNT VI

### VIOLATIONS OF THE TRUTH IN LENDING ACT 15 U.S.C. § 1601 *et seq.* (All Plaintiffs against the Citi Defendants)

160.    Plaintiffs Popkin, Ryan, and Freeman re-allege and incorporate paragraphs 1-117 above as if fully set forth herein and further allege as follows.

161.    Plaintiffs' and the Class Members' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, ("TILA"), and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

162.    The Citi Defendants are "creditors" as defined by TILA because they owned Plaintiffs' mortgages and changed the terms of the mortgages so as to create a new mortgage obligation, of which the Citi Defendants were creditors.

163.    Pursuant to TILA, the Citi Defendants were required to accurately and fully disclose the terms of the legal obligations between the parties. 12 C.F.R. § 226.17(c).

164.    The Citi Defendants violated TILA, specifically 12 C.F.R. § 226.17(c), when they (i) added force-placed insurance to Plaintiffs' mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickback, reinsurance, discount loan monitoring, and/or other profiteering involving the Citi Defendants

and/or their affiliates as a result of the purchase of force-placed insurance.

165.   When the Citi Defendants changed the terms of Plaintiffs' mortgages to allow previously unauthorized kickbacks and insurance amounts in excess of the Citi Defendants' interests in the property, they changed the finance charge and the total amount of indebtedness, extended new and additional credit through force-placed insurance premiums, and thus created a new debt obligation. Under TILA, the Citi Defendants were then required to provide a new set of disclosures showing the amount of the insurance premiums (i.e. finance charges) and all components thereof.   On information and belief, the Citi Defendants increased the principal amount under Plaintiffs' mortgages when they force-placed the insurance, which was a new debt obligation for which new disclosures were required.

166.   The Citi Defendants adversely changed the terms of Plaintiffs' loans after origination in order to allow themselves or an affiliate to receive a kickback on force-placed insurance premiums.   These kickbacks are not authorized in the mortgage in any clear and unambiguous way.   The Citi Defendants have never disclosed to its borrowers the amount of these "commissions" or other unearned profits paid to its affiliate.

167.   The Citi Defendants also violated TILA by adversely changing the terms of Plaintiffs' loans after origination by requiring and threatening to force-place more insurance than necessary to protect their interest in the property securing the mortgages.

168.   With respect to Plaintiffs Ryan, Freeman, and all force-placed flood insurance Class members, the Citi Defendants also violated TILA when they (i) misrepresented in insurance notices that Plaintiffs were obligated by federal law to maintain flood insurance in amounts greater than required by federal law, and/or greater than necessary to protect their interest in the property securing the mortgages; and (ii) failed to correct the original disclosures

40

when the prior disclosures clearly differ from the Citi Defendants' current insurance requirements.

169.    Acts constituting violations of TILA occurred within one year prior to the filing of this Complaint, or are subject to equitable tolling because the Citi Defendants' kickback, reinsurance, and other unearned revenue-generating scheme was the subject of secret agreements among the Citi Defendants and their affiliates and was concealed from borrowers.

170.    Plaintiffs and Class Members have been injured and have suffered a monetary loss arising from the Citi Defendants' violations of TILA.

171.    As a result of the Citi Defendants' TILA violations, Plaintiffs and Class Members are entitled to recover actual damages and a penalty of $500,000.00 or 1% of the Citi Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

172.    Plaintiffs and Class Members are also entitled to recovery of attorneys' fees and costs to be paid by Citi Defendants, as provided by 15 U.S.C. § 1640(a)(3).

**WHEREFORE**, Plaintiffs Popkin, Freeman, Ryan and all Class members similarly situated seek a judgment in their favor against the Citi Defendants awarding actual damages and a penalty of $500,000.00 or 1% of the Citi Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2), as well as of attorneys' fees and costs to be paid by Citi Defendants, as provided by 15 U.S.C. § 1640(a)(3).

## COUNT VII

## TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (All Plaintiffs against Assurant and American Security)

173.    Plaintiffs Popkin, Freeman, and Ryan re-allege and incorporate paragraphs 1-117 above as if fully set forth herein and further allege as follows.

174.    The above-named Plaintiffs and the Class members have advantageous business

and contractual relationships with the Citi Defendants pursuant to the mortgage contracts. These Plaintiffs and the Class have legal rights under these mortgage contracts. For example, these Plaintiffs and the Class have a right not to be charged exorbitant premiums in bad faith for forced-place insurance.

175. Assurant and American Security have knowledge of the mortgage contracts and the advantageous business and contractual relationships between these Plaintiffs and the Citi Defendants. Assurant and American Security are not parties to the mortgage contracts and are not third-party beneficiaries of the mortgage contracts. Further, Assurant and American Security do not have any beneficial or economic interest in the mortgage contracts.

176. Assurant and American Security intentionally and unjustifiably interfered with these Plaintiffs' and the Class's rights under the mortgage contracts, as described above by, *inter alia*, entering into an exclusive relationship with the Citi Defendants and their affiliate whereby they provide compensation (kickbacks, reinsurance, and low cost services) to the Citi Defendants in exchange for the exclusive right to force-place inflated and unnecessary premiums which are purposefully and knowingly charged to these Plaintiffs and the Class.

177. The above-named Plaintiffs and the Class have been damaged as a result of Assurant 's and American Security's interference with their mortgage contracts by being charged bad faith, exorbitant, and illegal charges for force-placed insurance in contravention of their rights under the mortgages.

**WHEREFORE**, Plaintiffs Popkin, Freeman, Ryan and all Class members similarly situated seek a judgment in their favor against Assurant and American Security for the actual damages suffered by them as a result of their tortious interference. Plaintiffs also seek all costs of litigating this action including attorney's fees.

<u>**COUNT VIII**</u>

<u>**VIOLATION OF THE ANTI-TYING PROVISIONS**</u>
<u>**OF THE BANK HOLDING COMPANY ACT, 12 U.S.C. § 1972 *et seq.***</u>
<u>**(All Plaintiffs against Citibank)**</u>

178.    Plaintiffs Popkin, Freeman, and Ryan re-allege and incorporate paragraphs 1-117 above as if fully set forth herein and further allege as follows.

179.    The Citi Defendants' kickback scheme violates the anti-tying provisions of the Bank Holding Company Act, 12 U.S.C. § 1972, *et seq.*

180.    The Bank Holding Company Act, 12 U.S.C. § 1972(b) ("BHCA") states that "a bank shall not in any manner extend credit, lease, or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement . . . (B) that the customer shall obtain some additional credit, property, or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company.

181.    Citibank or one of its subsidiaries or a subsidiary of Citibank's bank holding company provides services to the Citi Defendants in connection with the purchase of force-placed insurance.  Citibank requires Plaintiffs and class members to pay for these services in order to accept insurance procured on their behalf by the Citi Defendants.

182.    Citibank's purchase of insurance on borrowers' behalf is a service that Citibank offers to its borrowers. To accept this service, borrowers must agree to pay commissions to Citibank or its affiliate for unidentified services.

183.    Upon information and belief, Citibank entered into contractual arrangements under which it or one of its affiliates would act as the "broker" or "agent" for 100% of force-placed insurance policies purchased on behalf of Citibank borrowers. Under these agreements. The "agent" received a guaranteed commission for every force-placed insurance policy procured on behalf of Citibank's borrowers equal to a set percentage of the premium for each force-placed

43

policy.

184.    The "agent" does not engage in any insurance broker or agent services. For example, it does not seek out competitive insurance policies from different insurance providers, but refers all force-placed insurance business to Assurant or ASIC.

185.    This is an unusual practice.  Under the BHCA, an "unusual" banking practice is one that is not traditional within the banking industry. What is "unusual" about Citibank's force-placed insurance practices is that Citibank's exclusive purchase agreements with ASIC and Assurant obviate any opportunity for an insurance agent to earn a commission from borrowers. Citibank requires borrowers to pay for services that Citibank or its affiliate provides to Citibank and ASIC. The "agent" provides no services for borrowers themselves. In a "traditional" or "usual" setting, the agent would search for the best available or lowest cost insurance policy available for each borrower requiring force-placed insurance, instead of always purchasing the highest price, lowest coverage policies from ASIC.

186.    Federal National Mortgage Association recently amended its policies regarding force-placed insurance to explicitly prohibit mortgage servicers servicing loans owned by Fannie Mae from charging borrowers for any lender-placed insurance commission earned on a force-placed insurance policy by the servicer or any related entity, or costs associated with insurance tracking or administration. Fannie Mae directed its servicers to exclude charges for commissions to servicer-affiliated insurance agents from force-placed insurance charges. This is further evidence that Citibank's practices are "unusual."

187.    These practices are anti-competitive:

   a.    The Citi Defendants refer all force-placed insurance business to themselves or their insurance agent affiliate and guaranty their commissions. The commissions paid are based on contracts between Citibank and ASIC, not on any services actually provided to Plaintiffs and

Class members by the purported insurance agent. The agent has no competitive incentive to provide any services for borrowers;

b.  Citibank sets the commission amount that its agent affiliate will receive. The substantial revenue that ASIC receives in premiums from Citibank borrowers gives it an incentive to agree to any commission rate that Citibank demands;

c.  Citibank's tying arrangement results in unreasonably high commissions. The commissions are a percentage of ASIC's premiums. ASIC provides more limited insurance policies than borrowers can obtain on the market but cost significantly more than other policies the borrowers could obtain on the open market. Citibank's agreements allow its agent affiliate to receive more than twice the commission any other insurance agent would receive for procuring more limited insurance than any other insurance agent would procure;

d.  Unlike regular insurance agency arrangements, Citibank utilizes its power as borrowers' mortgage lender and/or servicer to guarantee payment of commissions. Citibank withdraws insurance premiums and commissions directly from borrowers' escrow accounts to pay commissions to itself or its agent affiliate. If borrowers refuse to make increased payments to their escrow account, Citibank coerces them into doing so with negative credit reporting and, potentially, foreclosing on their homes. Thus, Citibank uses its power as a bank to steer commissions to itself and its insurance agent affiliate;

e.  Citibank's force-placed insurance arrangement usurps market share from other insurance agencies in favor of Citibank or its insurance agent affiliate. Force-placed insurance may be a more costly option than purchasing insurance on the open market, but it is a significantly easier and less demanding option. Hundreds of thousands of homeowners in the United States have allowed Citibank to purchase force-placed insurance on their property, resulting in tens of millions of dollars in commissions being paid to Citibank;

f.  Citibank's exclusive purchase arrangement and kickback scheme artificially inflates the price of force-placed insurance and artificially increases commissions paid for force-placed insurance. The artificially inflated price of ASIC's force-placed insurance is only possible because Citibank refers 100% of its force-placed insurance business to ASIC. As one of the nation's largest mortgagees and mortgage servicers, Citibank's exclusive force-placed insurance referrals can and do substantially affect competitive incentives to reduce prices. This guarantees distorted commissions to Citibank or its insurance agent affiliate, whose commissions are a percentage of ASIC's inflated premiums.

45

188.    The "tied product" in this arrangement is Citibank's, or its insurance agent affiliate's, "service" of acting as an insurance agent for force-placed insurance.

189.    The "tying product" is Citibank's purchase of force-placed insurance for borrowers. Citibank also ties its continued extension of credit to Plaintiffs' and Class members' agreement to pay force-placed insurance commissions. Citibank would foreclose on Plaintiffs' and Class members' homes if they refused to pay the commissions after Citibank charged their escrow accounts for the commissions.

190.    Citibank ties the procurement of insurance on borrowers' behalf to its insurance agent "services" as alleged above.

191.    Citibank benefits directly and indirectly from this tying arrangement. Citibank or its insurance agent affiliate receives commissions on all force-placed insurance. Any commissions not directly paid to Citibank are remitted to Citibank, whether through direct money transfers, indirect money transfers through Citibank's holding company, or "soft dollar" transfers.

192.    Plaintiffs and all others similarly situated have been damaged by Citibank's anti-competitive tying arrangement in that they have paid unearned and inflated commissions to Citibank or its insurance agent affiliate.

**WHEREFORE**, Plaintiffs and the proposed Class are entitled to three times the amount of damages sustained, and the cost of suit, including a reasonable attorney's fee pursuant to 12 U.S.C. § 1975. Plaintiffs and the proposed Class are further entitled to an injunction barring Citibank from continuing its unlawful conduct, including its exclusive purchasing arrangement and kickback scheme with ASIC and Assurant.

46

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs on behalf of themselves and all similarly situated individuals demand judgment against Defendants as follows:

(1)       Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2) or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs and their counsel to be representatives of the Class;

(2)       Enjoining Defendants from continuing the acts and practices described above;

(3)       Awarding damages sustained by Plaintiffs and the Class as a result of the Citi Defendants' breaches of the subject mortgage contracts and the implied covenant of good faith and fair dealing, together with pre-judgment interest;

(4)       Finding that Defendants have been unjustly enriched and requiring them to refund all unjust benefits to Plaintiffs and the Class, together with pre-judgment interest;

(5)       Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses;

(6)       Awarding the Florida Plaintiffs and Subclass damages, injunctive relief, declaratory relief, attorneys' fees, and costs under FDUTPA;

(7)       Awarding damages sustained by Plaintiffs and the Class as a result of  Assurant's and American Security's tortious interference;

(8)       Awarding three times the amount of damages sustained, and the cost of suit, including a reasonable attorney's fee pursuant to the Bank Holding Company Act, 12 U.S.C. § 1975;

(9)       Awarding actual damages and a penalty of $500,000.00 or 1% of Defendants' net

47

worth, as provided by 15 U.S.C. § 1640(a)(1)-(2), and attorneys' fees and costs, as provided by 15 U.S.C. § 1640(a)(3); and

     (10)    Awarding such other and further relief the Court deems just and equitable.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

48

Respectfully submitted this 28th day of March, 2012.

By: /s/ Adam M. Moskowitz

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>amm@kttlaw.com<br>Thomas A. Tucker Ronzetti, Esq.<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>rn@kttlaw.com<br>**KOZYAK, TROPIN, &**<br>**THROCKMORTON P.A.**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br>*Counsel for Plaintiffs* | Aaron S. Podhurst, Esq.<br>apodhurst@podhurst.com<br>Peter Prieto, Esq.<br>pprieto@podhurst.com<br>Stephen F. Rosenthal<br>srosenthal@podhurst.com<br>John Gravante, III, Esq.<br>jgravante@podhurst.com<br>Matthew Weinshall<br>mweinshall@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, Florida 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Counsel for Plaintiffs* |
| Lance A. Harke, P.A.<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, Florida 33138<br>Telephone:      (305) 536-8220<br>Facsimile:       (305) 536-8229<br>*Counsel for Plaintiffs* | Jack Wagoner, III, Esq.<br>**WAGONER LAW FIRM, P.A.**<br>1320 Brookwood, Suite E<br>Little Rock, AR 72202<br>Telephone: (501) 663-5225<br>Facsimile: (501) 660-4030<br>jack@wagonerlawfirm.com<br>*Counsel for Plaintiffs* |
| Alexander P. Owings, Esq.<br>apowings@owingslawfirm.com<br>Steven A. Owings, Esq.<br>sowings@owingslawfirm.com<br>**OWINGS LAW FIRM**<br>1400 Brookwood Drive<br>Little Rock, AR 72202<br>Telephone: (501) 661-9999<br>Facsimile: (501) 661-8393<br>*Counsel for Plaintiffs* | Brent Walker, Esq.<br>Russell D. Carter, III<br>**CARTER WALKER PLLC**<br>2171 West Main, Suite 200<br>P.O. Box 628<br>Cabot, AR 72023<br>Telephone: (501) 605-1346<br>Facsimile: (501) 605-1348<br>bwalker@carterwalkerlaw.com<br>dcarter@carterwalkerlaw.com<br>*Counsel for Plaintiffs* |

| | |
|---|---|
| Chip Merlin, Esq.<br>cmerlin@merlinlawgroup.com<br>Mary E. Fortson, Esq.<br>mfortson@merlinlawgroup.com<br>Sean M. Shaw, Esq.<br>sshaw@merlinlawgroup.com<br>**MERLIN LAW GROUP, P.A.**<br>777 S. Harbour Island Blvd., Suite 950<br>Tampa, FL 33602<br>Telephone: 813-229-1000<br>Facsimile: 813-229-3692<br>*Counsel for Plaintiffs* | Jeffrey N. Golant, Esq.<br>jgolant@jeffreygolantlaw.com<br>**LAW OFFICES OF JEFFREY N. GOLANT, P.A.**<br>1000 W. McNab Road, Suite 150<br>Pompano Beach, FL 33069<br>Telephone: 954-942-5270<br>Facsimile: 954-942-5272<br>*Counsel for Plaintiffs* |
| Roy E. Barnes, Esq.<br>John R. Bevis, Esq.<br>bevis@barnesalwgroup.com<br>**BARNES LAW GROUP, LLC**<br>31 Atlanta Street<br>Marietta, GA 30060<br>Telephone: 770-227-6375<br>Facsimile: 770-227-6373<br>*Counsel for Plaintiffs* | Catherine E. Anderson, Esq.<br>canderson@gslawny.com<br>Oren Giskan, Esq.<br>ogiskan@gslawny.com<br>**GISKAN SOLOTAROFF ANDERSON & STEWART LLP**<br>11 Broadway Suite 2150<br>New York, New York 10004<br>Telephone: 212-847-8315 |
| Albert L. Frevola, Jr., Esq.<br>afrevola@conradscherer.com<br>Gary B. Englander, Esq.<br>genglander@conradscherer.com<br>Ivan J. Kopas, Esq.<br>ikopas@conradscherer.com<br>Matthew Seth Sarelson, Esq.<br>msarelson@conradscherer.com<br>**CONRAD & SCHERER, LLP**<br>P. O. Box 14723<br>Fort Lauderdale, Florida 33302<br>Telephone:     (954) 462-5500<br>Facsimile:     (954) 463-9244<br>*Counsel for Plaintiffs* | Brian J. Stack, Esq.<br>bstack@stackfernandez.com<br>Sammy Epelbaum, Esq.<br>sepelbaum@stackfernandez.com<br>**STACK FERNANDEZ ANDERSON & HARRIS, P.A.**<br>1200 Brickell Avenue, Suite 950<br>Miami, Florida 33131<br>Tel.  (305) 371-0001<br>Fax:  (305) 371-0002<br>*Counsel for Plaintiffs* |
| Guido Saveri, Esq.  (Cal. Bar No. 22349)<br>guido@saveri.com<br>R. Alexander Saveri, Esq.  (Cal. Bar No. 173102)<br>rick@saveri.com<br>Cadio Zirpoli, Esq.  (Cal. Bar No. 179108) | Michael L. Addicott, Esq.<br>mlaesq@addicottlaw.com<br>**ADDICOTT & ADDICOTT, P.A.**<br>900 N. Federal Hwy.<br>Ste. 201<br>Hallandale Beach, FL 33009 |

| cadio@saveri.com<br>**SAVERI & SAVERI, INC.**<br>706 Sansome Street<br>San Francisco, CA  94111<br>Telephone:  (415) 217-6810<br>Facsimile:   (415) 217-6813<br>*Counsel for Plaintiffs* | Telephone: 954-454-2605<br>*Counsel for Plaintiffs* |
|---|---|

344590.1